**Daniel DeNARDO, Appellant/Cross–Appellee,**

v.

**Joy BAX, Appellee/Cross–Appellant.**

**Nos. S–11487, S–11508.**

Supreme Court of Alaska.

Oct. 27, 2006.

Rehearing Denied Nov. 21, 2006.

---

45. AS 31.05.170(2).

46. AS 31.05.030(d)(9).

47. AS 31.05.170(2).

48. AS 31.05.110(a).

Daniel DeNardo, pro se, Anchorage, Appellant and Cross–Appellee.

Joan E. Rohlf, Guess & Rudd, P.C., Anchorage, for Appellee and Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Daniel DeNardo filed this lawsuit against his former coworker Joy Bax alleging defamation. DeNardo based his claim on comments made by Bax to coworkers that she was "worried that [DeNardo] was 'stalking' [her]." The superior court granted summary judgment to Bax on the grounds that her statements were privileged as statements of concern about personal safety in the workplace and that DeNardo had failed to provide

evidence that Bax abused the privilege. De-Nardo appeals, conceding that Bax's comments were privileged but arguing that there were sufficient factual issues surrounding the question of abuse that the issue should have been submitted to a jury rather than decided on summary judgment. Because the superior court correctly determined that DeNardo failed to produce sufficient evidence that Bax acted with knowledge or reckless disregard as to the falsity of her statements (thereby abusing the privilege) we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

Daniel DeNardo and Joy Bax were formerly coworkers at Alaska Newspapers, Inc. (ANI). When DeNardo was terminated from ANI, he filed a lawsuit in federal court against his former employer, its parent company Calista Corporation, and several former coworkers, including Bax. During a videotaped deposition in that case attended by Bax, DeNardo was asked by Joan Rohlf, attorney for defendants, if he was currently in possession of any weapons. DeNardo refused to answer.

Based on DeNardo's refusal to answer whether he was in possession of a weapon at the deposition, Rohlf moved for a protective order, requesting permission to conduct the remainder of DeNardo's deposition at the federal courthouse, where DeNardo would have to undergo a security screening. Attached to the motion were affidavits from Rohlf and three of the codefendants present at the deposition, including Bax.

Bax's affidavit in support of the motion stated:

I attended Mr. DeNardo's deposition on March 9, 2001. I was extremely concerned when Mr. DeNardo refused to answer whether he had brought a weapon to the deposition. When we worked together at ANI, there were several occasions when Mr. DeNardo followed me in his vehicle. I was worried that he was "stalking" me. I have expressed concern about this to Holly Parsons and other defendants in this action, as well as to Ms. Rohlf. Annie Harris has expressed concern to me that Mr. De-Nardo was loitering around her personal residence last fall. Holly Parsons has expressed similar concerns. Based on my observations and knowledge of Mr. DeNardo while we worked together at ANI, and based on these incidents, I am very concerned about my personal safety in Mr. DeNardo's presence.

### B. Proceedings

In response to this affidavit, DeNardo filed a new lawsuit in superior court alleging that Bax maliciously made statements to coworkers, Holly Parsons and Annie Harris, that DeNardo was stalking Bax. DeNardo claimed that Bax's statements were "maliciously made," "false, defamatory, spurious, and libelous," and "were understood by others as referring to DeNardo and charging DeNardo with the corrupt and dishonorable conduct of stalking which is criminal conduct in the State of Alaska." In the complaint, DeNardo denied stalking or following Bax.

During the course of discovery, DeNardo filed several interrogatories and requests for production. Bax moved for a protective order asking that the superior court limit DeNardo's access to certain witnesses and preclude discovery irrelevant to the defamation suit. The superior court granted this motion, allowing DeNardo to depose Bax's former employers and ex-husband only if DeNardo provided proper notice to Bax's counsel and each deponent and only if Bax's counsel was present at the depositions. The superior court's order required all telephone conversations between DeNardo and Bax's ex-husband, coworkers, or supervisors to be conducted as conference calls in which Bax's counsel could participate. The superior court limited the scope of these depositions and phone calls as follows: "DeNardo may ask whether: (1) Bax ever informed the witnesses whether she had ever been stalked ... followed, or harassed by Mr. DeNardo; (2) what such stalking or harassment reportedly consisted of; and (3) the basis for Bax's stated belief." The superior court also permitted DeNardo to ask whether Bax had informed witnesses that DeNardo had "loitered at residences." The order specified that DeNardo was not allowed to

ask witnesses about Bax's personal life or social relationships and was not permitted to question the witnesses about information irrelevant to the defamation claim. The court noted that Bax was not required to provide DeNardo with her current address as long as she was represented by counsel. DeNardo also was not allowed to contact Bax's twelve-year-old daughter. DeNardo moved for a reconsideration of the court's protective order, but that motion was denied.

Bax moved for summary judgment, arguing that her statements were not false because they were based on her own observations and subjective concern that DeNardo was following and possibly stalking her. She also asserted that the statements in her affidavit filed in the federal court case were absolutely privileged and that the conversations she had with coworkers that were referenced in her affidavit were conditionally privileged because coworkers share a common interest in workplace safety.

DeNardo opposed Bax's motion, denying that he ever stalked Bax and claiming that Bax's allegation that DeNardo stalked her was defamation per se. He further argued that "[e]ven assuming a conditional privilege, it is a jury issue whether the privilege is lost from abuse upon a showing of reckless disregard, deliberate indifference, or actual malice."

The superior court granted Bax's summary judgment motion, finding that Bax's statements in the sworn affidavit filed in the federal court case were "completely" privileged and that the statements made by Bax to coworkers, memorialized in the affidavit, were protected by a conditional privilege, the abuse of which DeNardo had failed to establish. Although the superior court held that Bax was not entitled to summary judgment on the questions whether her statements were false or negligently made or whether Bax's statements were defamation per se, the superior court found that "nothing has been submitted . . . to support a finding that Mr. DeNardo has shown that Ms. Bax in making these statements was making them with knowledge or reckless disregard as to their apparent falsity."

On appeal, DeNardo argues that even if Bax's comments were privileged, there are disputed facts as to whether the privilege was abused. Therefore, he argues, his claims should have been submitted to a jury rather than disposed of on summary judgment. He further challenges the superior court's protective order as a violation of the work product privilege and his right to discovery.[1]

## III. DISCUSSION

### A. Standard of Review

■ The superior court has broad discretion to determine the scope and extent of discovery and to craft protective orders.[2] A court's protective order restricting discovery will not be overruled absent abuse of discretion.[3]

■ We review a grant of summary judgment de novo, affirming if the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[4] When considering a motion for summary judgment, all reasonable inferences of fact from the proffered evidence

---

1. Bax "conditionally appeals the superior court's determination that the word 'stalking' is defamatory per se given the context in which it was used." But in doing so, Bax misapprehends the superior court's decision, which reached no conclusion as to whether use of the phrase "stalking" in this context constituted defamation per se. The superior court stated that because stalking is a second degree misdemeanor, "for purposes of . . . summary judgment I would find that [defamation per se] would not be a basis to accord the defendant the requested relief." Because the superior court did not decide the question whether Bax's comments constituted defamation per se, and because we af-

firm the superior court's grant of summary judgment on the ground that Bax's comments were privileged, we need not address Bax's argument.

2. *Jones v. Jennings*, 788 P.2d 732, 735 (Alaska 1990).

3. *Fuller v. City of Homer*, 113 P.3d 659, 662 (Alaska 2005).

4. *Briggs v. Newton*, 984 P.2d 1113, 1117 (Alaska 1999).

must be drawn against the moving party and in favor of the non-moving party.[5]

Whether a statement is defamatory[6] and whether a statement is afforded privilege[7] are questions of law. If the relevant facts of the case are disputed, a jury must determine if a conditional privilege has been abused.[8] When considering legal issues of first impression, such as whether a previously unrecognized privilege applies, we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[9]

**B. The Superior Court's Protective Order Did Not Inappropriately Restrict Discovery.**

As a threshold matter, we address DeNardo's appeal of the superior court's decision granting Bax's motion for a protective order. Under Alaska Civil Rule 26(b)(1) a party "may obtain discovery regarding any matter, not privileged which is relevant to the subject matter involved in the pending action." But the court can, with good cause, enter any protective order that "justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."[10] Civil Rule 26(c) allows the court to deny discovery, to designate certain terms and conditions for discovery, to regulate the method of discovery, and to limit the scope of discovery.[11]

**1. The superior court's protective order struck a reasonable balance between DeNardo's right to discovery and Bax's right to be protected from unduly intrusive discovery.**

The superior court did not abuse its discretion when it limited DeNardo's discovery to facts relevant to his defamation claim. DeNardo's defamation claim centered on whether Bax made defamatory statements to her coworkers that she was worried DeNardo was stalking her and whether these statements were made with malice. The superior court's order confining discovery to whether Bax ever informed witnesses that she had been stalked or harassed by DeNardo, what such stalking or harassment consisted of, and the basis for Bax's stated belief, struck a reasonable balance between DeNardo's right to discovery on his claim, and Bax's right to be protected from "annoyance, embarrassment, oppression, or undue burden or expense."[12]

The superior court's order that DeNardo was not permitted to elicit information about Bax's personal life or social relationships and was not entitled to Bax's address also achieved a reasonable balance. In seeking a protective order, Bax informed the trial court that she was "gravely concerned about disclosing her current address to Mr. DeNardo for the very reason that has become the subject of this lawsuit: Mr. DeNardo followed her on several occasions in the past, eavesdropped on her private conversations at work, and reportedly has shown up unexpectedly near the residences of at least two of their former female co-workers." Given the nature of the controversy—a defamation claim based on Bax's expression that she was worried DeNardo was stalking her, which was only brought to DeNardo's attention in an affidavit in support of a motion seeking a secure location to conduct a deposition for fear that DeNardo was carrying a weapon—the court was well within the bounds of its discretion in limiting access to this personal and only tangentially relevant information. Because of the nature of the dispute, the court also reasonably prohibited DeNardo from contacting Bax's young daughter. Moreover, there is no indication from the record that Bax's daughter would be likely to provide any relevant evidence.

**5.** *Alakayak v. British Columbia Packers, Ltd.,* 48 P.3d 432, 449 (Alaska 2002).

**6.** *Schneider v. Pay'N Save Corp.,* 723 P.2d 619, 624–25 (Alaska 1986).

**7.** *French v. Jadon, Inc.,* 911 P.2d 20, 33 (Alaska 1996).

**8.** *Id.*

**9.** *Taranto v. North Slope Borough,* 992 P.2d 1111, 1113 (Alaska 1999).

**10.** Alaska R. Civ. P. 26(c).

**11.** *Id.*

**12.** *Id.*

DeNardo's arguments that the court's protective order "restricted the presentation of facts on summary judgment," and that "Bax's family members, former husband, former employers, and neighbors basically were ruled out of bounds" are unpersuasive in light of both the reasonableness of the superior court's order and the fact that DeNardo made no effort to depose any witnesses to support his claim within the sensible parameters drawn by the superior court.

We therefore conclude that the superior court did not abuse its discretion when it crafted a protective order designed to "balance Mr. DeNardo's right to the discovery of relevant information against Ms. Bax's right to privacy and her fears for the personal safety of herself and her daughter."

### 2. The superior court's protective order did not violate the attorney work product privilege.

■ DeNardo also argues that the superior court's order allowing DeNardo to interview and depose witnesses only in the presence of Bax's counsel violated the work product privilege. He alleges that the protective order "affected [his] interview strategy, the witness' testimony, and allowed Bax to be privy to the content of [his] notes and fact collection." In so arguing, DeNardo misconstrues the work product privilege.

■ The attorney work product privilege is designed to protect the mental impressions, conclusions, and opinions of an attorney in the preparation of materials for use in litigation.[13] As set forth in *Langdon v. Champion*, in order for materials to qualify for work product protection, the material involved must be: (1) a document or other tangible thing, (2) prepared in anticipation of litigation or for trial, and (3) prepared by or for the opposing party's attorney or representative.[14]

Bax did not seek discovery of any documents or tangible items prepared by De-

Nardo for use in this litigation that could potentially be subject to the work product privilege, nor did the protective order compel production of or even address any such materials. Additionally, the mere presence of Bax's counsel at depositions and in witness interviews would not violate the purposes of the work product privilege. Bax's counsel, through her presence, would not have access to DeNardo's mental impressions, conclusions, and opinions. The protective order therefore did not violate the work product privilege.

### C. Summary Judgment Was Properly Granted Because Bax's Statements to Coworkers Were Privileged and DeNardo Presented No Evidence that the Privilege Was Abused.

■ In order for a defamation claim to succeed, a plaintiff must establish:

(1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence; and (4) the existence of either "per se" actionability or special harm.[15]

The superior court determined that DeNardo failed to establish the second element, an unprivileged communication, and granted summary judgment in favor of Bax. The superior court reasoned that the statements Bax made to coworkers that "she felt she was being stalked" were conditionally privileged as statements of concern about personal safety in the workplace.

DeNardo does not challenge the superior court's determination that Bax's statements were privileged. Rather, he raises a claim that he was entitled to a jury trial on whether Bax abused the conditional privilege. But because we have never directly addressed the question whether a conditional privilege exists with respect to statements among coworkers about personal safety in the workplace, we first recognize that such a privilege applies.

---

**13.** *Walden v. Dep't of Transp.*, 27 P.3d 297, 308 (Alaska 2001).

**14.** 752 P.2d 999, 1005 (Alaska 1988) (citing Alaska R. Civ. P. 26(b)(3); 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2024, at 196–97

(1970); 4 J. MOORE, J. LUCAS & G. GROTHEER, MOORE'S FEDERAL PRACTICE ¶¶ 26.64[1]-[4], at 26–348 to 26–389).

**15.** *French*, 911 P.2d at 32; *see also* RESTATEMENT (SECOND) OF TORTS § 558 (1977).

In the past, "we have recognized a conditional privilege based on a joint business interest or an employer/employee relationship when a statement is made 'for the protection of a lawful business, professional, property or other pecuniary interest.' "[16] And in *Taranto v. North Slope Borough*, we found that "speech on matters of public safety is privileged."[17] While communications among coworkers concerning personal safety in the workplace do not fall squarely within the ambit of either of these recognized privileges, our previous acknowledgment of the importance of protecting speech regarding business interests and public health and safety lends support to recognition of a privilege in this case.

We will acknowledge a conditional privilege when a person "having a common interest in a particular subject matter believes that there is information that another sharing the common interest is entitled to know."[18] According to the Restatement (Second) of Torts, "[a]n occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest."[19] Where, as here, a worker reveals to coworkers that she is concerned that another coworker might be stalking her, a sufficiently important interest to the statement's publisher, her personal safety, is at stake. Furthermore, by alerting coworkers to her fears, Bax protected her interest in personal safety by attuning coworkers to the possibility that she was the victim of dangerous behavior. Recognition of a privilege under these circumstances is necessary in order to facilitate an environment in which employees feel safe while performing their duties.

At the summary judgment stage, it was Bax's initial burden to establish that she was entitled to prevail as a matter of law, by demonstrating that a conditional privilege applies and that she did not abuse the applicable conditional privilege. In the trial court, Bax satisfied this initial burden by relying on her federal court affidavit as evidence that she did not abuse the privilege, arguing in her briefing to the trial court:

> In her motion, Ms. Bax presented evidence that she did not abuse the privilege. Ms. Bax's affidavit states: "When we [Ms. Bax and Mr. DeNardo] worked together at ANI [Alaska Newspapers, Inc.] there were several occasions when Mr. DeNardo followed me in his vehicle. I was worried that he was 'stalking' me.". . . Therefore, the proof that Ms. Bax actually saw Mr. DeNardo (or at least *thought* she did) is her affidavit itself. Ms. Bax's sworn affidavit shows that her statements were not made knowing they were false, and that her statements were not made with a reckless disregard for the truth.

Once Bax established a prima facie case that a conditional privilege applied and that she did not abuse the privilege, the burden shifted to DeNardo to show that the privilege had been abused.[20] We have established that a conditional privilege may be abused:

(1) when there is malice—the publisher had knowledge or reckless disregard as to the falsity of the defamatory matter;

(2) because the defamatory matter is published for some purpose other than that for which the particular privilege is given;

(3) because the publication is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege; or

(4) because the publication includes defamatory matter not reasonably believed to

---

**16.** *Briggs*, 984 P.2d at 1121 (quoting *Schneider*, 723 P.2d at 623 (internal citations omitted)).

**17.** 992 P.2d at 1115.

**18.** *Schneider*, 723 P.2d at 623–24 (citing *Lull v. Wick Constr. Co.*, 614 P.2d 321 (Alaska 1980)) (internal quotation marks omitted).

**19.** Restatement (Second) of Torts § 594 (1977).

**20.** *See Briggs*, 984 P.2d at 1121 ("Ordinarily, once a defendant establishes the existence of a privilege the plaintiff has the burden of showing that it has been abused.").

be necessary to accomplish the purpose for which the occasion is privileged.[21]

Before the superior court, De-Nardo contended that Bax abused the conditional privilege because she acted with malice: knowledge or reckless disregard as to the falsity of her statements. Because the actual malice test for determining abuse of a conditional privilege is subjective, at the summary judgment stage the court must determine "whether there is a genuine issue of material fact on whether [the defendant] entertained serious doubts as to the truth of the statements."[22] We note that the false and defamatory comment that Bax allegedly made was that Bax was worried that DeNardo was stalking her and not that he was in fact stalking her. On summary judgment, DeNardo therefore has the burden of raising a material issue of fact on the question whether Bax entertained serious doubts about the truth of her statement that she was subjectively worried DeNardo was stalking her.

In support of DeNardo's claim that Bax's statement was made with malice, DeNardo essentially makes three arguments: (1) since Bax did not publish her statement of concern widely enough, she was not actually worried that DeNardo was stalking her; (2) Bax had a motive to lie because she and DeNardo had a workplace rivalry, which resulted in De-Nardo naming Bax as a defendant in his federal lawsuit against his employer; and (3) during the intermission of DeNardo's deposition in the federal lawsuit, Bax shared lunch with DeNardo, Parsons, and Harris, and "[n]obody displayed any fear and nobody objected." Even drawing all reasonable inferences in favor of DeNardo as the non-moving party, these allegations fail to raise a genuine issue of material fact on the question whether Bax entertained serious doubts as to the truth of her statement that she subjectively believed DeNardo was stalking her.

On the issue of the narrow scope of publication, DeNardo noted in his opposition to Bax's summary judgment motion that Bax only spoke to "sales manager Brandy Johnson, and co-workers Holly Parsons and Annie Harris. Bax never told her husband, children, family, neighbors, Calista Corporation management, Alaska Newspapers Inc. management, or any governmental authority about plaintiff's stalking!" He also noted that "[o]ne day Bax saw [DeNardo] entering the Fred Meyer on Dimond after work. She never reported [DeNardo] was stalking her."

DeNardo does not meet his burden by pointing to the limited scope of Bax's publication. As DeNardo concedes, Bax expressed her concerns solely to her coworkers—those who knew DeNardo and were in the best position to observe the interaction between Bax and DeNardo in the workplace on a daily basis. It would not be reasonable to infer that Bax had serious doubts that her statements were true simply because she only discussed her concerns with those most familiar with her situation and those best able to assist her if DeNardo, a coworker, turned out to in fact be stalking her.

Moreover, excessive publication to persons not reasonably believed to be necessary for the accomplishment of the purpose of the privilege would constitute abuse of the privilege.[23] That Bax limited the publication of her statement to two coworkers and her supervisor—those most suited to respond if Bax's subjective fear that DeNardo was stalking her proved true—supports the conclusion that her statement was well within the bounds of the common interest privilege in workplace safety, and not that Bax doubted the truth of her statements. In fact, the scope of Bax's publication appears to have been so narrow that DeNardo did not even learn about Bax's concern until he read her affidavit in the federal lawsuit when Bax's attorney, for fear that DeNardo was carrying a weapon, moved to relocate his deposition to federal court.

---

**21.** *Schneider,* 723 P.2d at 624–25 (adopting standards set forth in Restatement (Second) of Torts § 599 cmt. a (1977)).

**22.** *Mount Juneau Enters., Inc. v. Juneau Empire,* 891 P.2d 829, 834 (Alaska 1995).

**23.** *Schneider,* 723 P.2d at 624–25 (adopting standards set forth in Restatement (Second) of Torts § 599 cmt. a (1977)).

Furthermore, DeNardo had the opportunity to question witnesses about the basis for Bax's belief that DeNardo was stalking her in order to bolster his claim that she entertained doubt as to the truth of her statements, but he declined to take advantage of that opportunity when he failed to depose any witnesses. The mere suggestion that Bax would have told her husband, children, family, friends, neighbors, etc., had she really believed DeNardo was stalking her is insufficient to raise a genuine issue of material fact that she entertained serious doubts that she was worried DeNardo was stalking her.

■ DeNardo points to evidence that Bax had a motive to defame him because she coveted his customer lists and commissions and because he filed an evaluation and notice of discrimination of a hostile workplace naming Bax as one of the perpetrators. DeNardo also notes that he named Bax as a plaintiff in the federal lawsuit filed against his former employers. Affidavits attached to DeNardo's opposition to Bax's summary judgment motion could support an inference that there was some ill will between DeNardo and Bax when they were coworkers at ANI. For example, incorporated into DeNardo's brief were interrogatories of Calista Corporation and ANI from the federal lawsuit. When asked about oral or written complaints about DeNardo, Calista Corporation and ANI responded:

> On a few occasions, Holly Parsons and Joy Bax had disputes with plaintiff [DeNardo] regarding who was entitled to commissions on ads which were brought to the attention of Brandy Johnson and/or Chris Casati. Holly Parsons and Joy Bax also discussed with Brandy Johnson and/or Chris Casati their concerns about plaintiff's unilateral declaration that certain sales prospects "belonged" to plaintiff, and concerns that plaintiff attempted to take over sales prospects that they were already pursuing. Joy Bax expressed concern to Brandy

Johnson that plaintiff seemed to listen in on her telephone conversations, and listed prospects on his "cold call" list the week after Ms. Bax had had those prospects on her "cold call" list.

But evidence of ill will alone is not sufficient to establish abuse of the privilege. According to the Restatement (Second) of Torts § 603 cmt. a (1977):

> [A] publication of defamatory matter upon an occasion giving rise to a privilege, if made *solely* from spite or ill will, is an abuse and not a use of the privilege. However, if the publication is made for the purpose of protecting the interest in question, the fact that the publication is inspired in part by resentment or indignation at the supposed misconduct of the person defamed does not constitute an abuse of the privilege.

(Emphasis added.) In most jurisdictions, evidence that a defendant disliked a plaintiff is insufficient to establish abuse of the privilege.[24] Instead, "[i]t must be shown that the improper motive was predominant." [25] For example, the United States Court of Appeals for the District of Columbia has explained that

> the mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege if the privilege is otherwise established by the occasion and a proper purpose. Rather, the court looks to the primary motive by which the defendant is apparently inspired; and, the fact that he feels resentment and indignation towards the plaintiff and enjoys defaming him will not forfeit the privilege so long as the primary purpose is to further the interest which is entitled to protection.[26]

Here DeNardo alleges that Bax harbored ill will toward him because she competed with him for customers and commissions when they were employees at ANI and be-

---

**24.** Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems 9.3.1 (2004).

**25.** *Id.*

**26.** *Novecon Ltd. v. Bulgarian–American Enter. Fund,* 190 F.3d 556, 567 (C.A.D.C.1999) (internal citations omitted); *see also Liberman v. Gelstein,* 80 N.Y.2d 429, 590 N.Y.S.2d 857, 605 N.E.2d 344, 350 (1992) ("If the defendant's statements were made to further the interest protected by the privilege, it matters not that defendant *also* despised plaintiff.").

cause he implicated her in a workplace discrimination claim at both ANI and in federal court. But evidence that Bax might have disliked DeNardo does not cast doubt upon her statement that she feared DeNardo was stalking her. DeNardo even concedes that he saw Bax in the parking lot of Fred Meyer.[27] His allegations of animosity between himself and Bax do not even speak to the question whether she might have actually felt fear when she encountered him. He therefore did not raise a question of fact that Bax's statement was made "solely from spite or ill will." [28]

It bears repeating that DeNardo's claim is based on a comment that Bax made in an affidavit in an unrelated federal case which was filed because DeNardo refused to answer whether he was carrying a weapon in a deposition. Bax informed the court:

> When we worked together at ANI, there were several occasions when Mr. DeNardo followed me in his vehicle. I was worried that he was "stalking" me. I have expressed concern about this to Holly Parsons and other defendants in this action, as well as to Ms. Rohlf. Annie Harris has expressed concern to me that Mr. DeNardo was loitering around her personal residence last fall. Holly Parsons has expressed similar concerns. Based on my observations and knowledge of Mr. DeNardo while we worked together at ANI, and based on these incidents, I am very concerned about my personal safety in Mr. DeNardo's presence.

Bax's publication was made "for the purpose of protecting the interest in question," workplace safety, and therefore the fact that the publication might have been "inspired in part by resentment or indignation at the supposed misconduct of [DeNardo] does not constitute an abuse of the privilege." [29]

Finally, DeNardo does not meet his burden when he notes that during the intermission of DeNardo's deposition in the federal lawsuit, Bax shared lunch with DeNardo, Parsons and Harris, and "[n]obody displayed any fear and nobody objected." The fact that DeNardo and Bax publicly ate lunch together during an intermission from his deposition and DeNardo did not perceive Bax display any fear does nothing to further his argument that she entertained serious doubts as to the truth of the statements she made to coworkers when she and DeNardo were both employed at ANI.

While DeNardo arguably set forth sufficient evidence to establish that Bax disliked him, he set forth no evidence to establish that Bax "entertained serious doubts as to the truth of the statements." [30] Because DeNardo has failed to meet his burden, we affirm the superior court's decision to grant summary judgment to Bax.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the superior court's protective order was not an abuse of discretion. Because Bax's statement that she feared DeNardo was stalking her was privileged as a statement of concern about personal safety in the workplace, and because DeNardo has not raised a genuine issue of material fact with respect to abuse of the privilege, we also AFFIRM the superior court's grant of summary judgment to Bax.

---

27. We are in accord with the superior court's assessment of this incident:

    [T]here has been nothing that has been submitted in my reading of the record to support a finding that Mr. DeNardo has shown that Ms. Bax in making these statements was making them with knowledge or reckless disregard as to their apparent falsity. Which is to say that I hear an acknowledgment by Mr. DeNardo that in point of fact these folks were walking out to their cars at the same time and did have an encounter at a shopping mall and Ms. Bax perceived that in a way that Mr. DeNardo clearly takes issue with, but he ... has not presented any evidence to support a finding that there was knowledge or reckless disregard by Ms. Bax in making these statements to her co-workers regarding issues of safety at the workplace, which is an issue of great concern to many people and an appropriate issue to bring up to one's co-workers.

28. *See* RESTATEMENT (SECOND) OF TORTS § 603 cmt. a (1977).

29. *See id.*

30. *See Mount Juneau Enters., Inc.,* 891 P.2d at 834.

EASTAUGH, Justice, dissenting.

**Introduction.** I respectfully dissent. The court affirms Bax's summary judgment because it concludes that DeNardo did not demonstrate the presence of a genuine issue of material fact about whether Bax abused the conditional privilege that attached to the statements she made to coworkers.[1] I agree that Bax made out a prima facie showing that her statements were conditionally privileged because they ostensibly addressed workplace or (perhaps) mutual safety.[2] But this simply means that we must decide whether, as DeNardo argued below and argues here, there are genuine factual disputes about whether Bax abused, and therefore lost, the conditional privilege. In my view, the record reveals at least two genuine factual issues material to that question: whether she had knowledge or reckless disregard as to the falsity of her statements to coworkers that DeNardo was following her or stalking her, and whether she spoke for a privileged purpose. The record also raises questions about whether the words she actually spoke to coworkers expressed an opinion rather than a statement of fact. We should therefore vacate the summary judgment and remand.

**Controlling legal principles.** Before we turn to the pertinent evidence, it is useful to consider the two controlling legal principles, one substantive and one procedural, that set the stage for the analysis we should follow.

The substantive principle concerns the scope of the conditional privilege that attaches to communications about workplace safety or other matters of common interest. A declarant abuses a conditional privilege if (1) she knows the defamatory matter to be false or acts in reckless disregard as to its truth or falsity,[3] (2) the defamatory matter is published for some purpose other than that for which the particular privilege is given (e.g., solely out of spite or ill will), (3) the publication is made to an unnecessary recipient, or (4) the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged.[4] The first two grounds potentially apply here.

The procedural principle concerns the standard for granting and reviewing summary judgment in Alaska. Summary judgment may not be entered and therefore may not be sustained on appeal if there is a genuine issue of material fact.[5] It is a legal question whether a genuine issue of material fact exists; we therefore exercise our independent judgment in reviewing the facts and the inferences reasonably drawn from them in favor of the appellant when we decide whether a genuine, material factual dispute exists.[6]

Alaska law imposes a low threshold for defeating a motion for summary judgment. In *Moffatt v. Brown*, a libel case, we declined to adopt the Supreme Court's interpretation of the federal summary judgment standard

1. At 681–82.

2. *See Taranto v. North Slope Borough*, 992 P.2d 1111, 1115 (Alaska 1999) (holding that speech on matters of public safety is conditionally privileged); RESTATEMENT (SECOND) OF TORTS § 594 (detailing conditional privilege for speech related to "sufficiently important interest of publisher").

3. A conditionally privileged declarant traditionally abused the privilege if she did not believe the statement to be true or lacked reasonable grounds for so believing. As a result of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1973), in which the Supreme Court held that strict liability in defamation is unconstitutional, the traditional conditional privilege standard was modified: "mere negligence as to falsity, being required [now] for all actions of defamation, is no longer treated as sufficient to constitute abuse of a conditional privilege.

Instead knowledge or reckless disregard as to falsity is necessary for this purpose." RESTATEMENT (SECOND) OF TORTS § 599 cmt. d (1977). This court's precedents have not been entirely clear on this point. *See Briggs v. Newton*, 984 P.2d 1113, 1121 (Alaska 1999) (determining whether declarant abused privilege by deciding whether he had "reasonable belief" in truth of statement); *accord Schneider v. Pay'N Save*, 723 P.2d 619, 625 (Alaska 1986).

4. *Schneider*, 723 P.2d at 624–25 (adopting standards set forth in RESTATEMENT (SECOND) OF TORTS § 599 cmt. a (1977)).

5. *See* Alaska R. Civ. P. 56(c); *Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 447 (Alaska 2002).

6. *Alakayak*, 48 P.3d at 447.

announced in *Anderson v. Liberty Lobby, Inc.*[7] As we explained:

> Instead of adopting the summary judgment standard articulated in *Anderson,* we choose to continue our longstanding interpretation of our summary judgment standard as contained in Civil Rule 56(c). Civil Rule 56(c) directs a court to grant a motion for summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." We decline to incorporate the applicable substantive evidentiary standard into this state's summary judgment practice [as was done in *Anderson*] . . . . Rule 56(c) only requires a showing that a genuine issue of material fact exists to be litigated, and not a showing that a party will ultimately prevail at trial.[8]

We noted that as a consequence of this holding, "it is somewhat harder for a libel defendant to win summary judgment in our state courts, using the 'no genuine issue of material fact' standard, than in federal court."[9] Although a non-movant must present more than a "scintilla" of evidence to avoid summary judgment, the non-movant need only present enough evidence to "reasonably tend[ ] to dispute or contradict" the evidence presented by the movant.[10] Moreover, we have held that we will not weigh evidence

7. *Moffatt v. Brown*, 751 P.2d 939, 943 (Alaska 1988) (discussing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

8. *Id.* at 943–44 (internal citations omitted); *see also Alakayak*, 48 P.3d at 449.

9. *Moffatt*, 751 P.2d at 944.

10. *Alakayak*, 48 P.3d at 449.

11. *Id.*

12. *Id.* (emphasis in original); *see also Meyer v. State, Dep't of Revenue, Child Support Enforcement Div. ex rel. N.G.T.*, 994 P.2d 365, 367 (Alaska 1999) (holding that putative father's sworn denial of paternity prevented summary judgment, even though movant had presented strong scientific evidence showing paternity, because *"any* evidence sufficient to raise a genuine issue of material fact precludes a summary finding of paternity") (internal quotation marks omitted) (emphasis in original).

when reviewing a decision on summary judgment.[11] "[T]here is a 'genuine issue' of material fact as long as the nonmovant has presented *some* evidence in support of its legal theory."[12]

The standard for granting and upholding summary judgments in Alaska is therefore more rigorous than the federal standard.[13] It does not matter under the Alaska standard which party will ultimately bear the burden of persuasion should the case go to trial.[14] "Whether a defendant has abused a privilege is a question of fact for the jury unless the facts are such that only one conclusion can reasonably be drawn."[15] Here, the question on summary judgment should be whether DeNardo raised a genuine issue of material fact about whether Bax abused the conditional privilege; stated differently, the question is whether the court file contained evidence reasonably contradicting Bax's claim that her statements were protected by the privilege.[16] In this case as it is presented to us, all that matters is whether there is more than a scintilla of evidence demonstrating the existence of facts that, if believed, would permit a reasonable person to find that either (1) Bax knew her statements were false, (2) she entertained serious doubts as to their truth, or (3) her primary purpose was not to advance the identified privileged interest.[17]

13. Bax does not argue that we should jettison that standard in favor of the prevailing federal standard so we have no occasion here to reconsider the appropriate standard.

14. *See Ball v. Birch, Horton, Bittner & Cherot*, 58 P.3d 481, 485 (Alaska 2002).

15. *See Schneider*, 723 P.2d at 624.

16. *See Lull v. Wick Constr. Co.*, 614 P.2d 321, 325 (Alaska 1980) (holding that summary judgment was appropriately granted because plaintiff had not established triable issue of fact regarding whether declarant had abused conditional privilege).

17. The court's opinion states the standard as follows: "DeNardo . . . has the burden of raising a material issue of fact on the question whether Bax entertained serious doubts about the truth of her statement that she was subjectively worried DeNardo was stalking her." At 680. That would be the correct standard if the court were only required to consider whether Bax abused

Circumstantial evidence is normally needed to establish an actor's purpose or intent, because in the context of disputed endeavors, actors often do not expressly admit their true reasons for acting.[18] Circumstantial evidence is the only evidence presently available relevant to Bax's belief and intentions and to whether summary judgment was correctly entered against DeNardo.

What are the sources of the relevant facts? We must look to sources that satisfy Alaska Civil Rule 56(c). Here these sources include DeNardo's verified complaint, his verified opposition to Bax's summary judgment motion, Bax's sworn responses to interrogatories and production requests, and the affidavits of Bax and coworker Holly Parsons.[19]

**Factual background.** DeNardo filed his defamation suit against Bax and others after Bax served and filed her April 4, 2001 affidavit in DeNardo's then-pending federal action, *DeNardo v. Calista Corp., et al.*, Case No. A00-309 Civil. Bax's affidavit supported her motion for a protective order to require that DeNardo's unfinished deposition be completed at the federal courthouse. It also revealed to DeNardo that she had previously spoken about him to others. Thus, it stated that she and DeNardo had worked at ANI for about seven months as advertising sales representatives, and that she had been concerned about her personal safety in DeNardo's presence and was extremely concerned because he had refused at his deposition to answer whether he had brought a weapon to the deposition. She also stated in her affidavit that

> when we worked together at ANI, there were several occasions when Mr. DeNardo followed me in his vehicle. I was worried that he was "stalking" me. I have expressed concern about this to Holly Parsons and other defendants in this action, as well as to [my attorney].

What Bax said in her affidavit for the federal court was absolutely privileged, as Judge Gleason correctly ruled below.[20] De-

---

the privilege by acting with "actual malice"—i.e., with knowledge or reckless disregard as to the falsity of the defamatory statements. *See Schneider*, 723 P.2d at 624; *Briggs*, 984 P.2d at 1121. But the opinion then considers whether DeNardo raised an issue about whether Bax abused the privilege by publishing the defamatory matter for some purpose other than that for which the privilege is given (i.e., solely for spite or ill will). At 681–682. *See Schneider*, 723 P.2d at 624; Restatement (Second) of Torts § 603 cmt. a (1977). The opinion's recitation of the standard is apparently too narrow.

**18.** *See Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 434–35 (Alaska 2004); *see also Indus. Commercial Elec., Inc. v. McLees*, 101 P.3d 593, 600 (Alaska 2004) (holding that circumstantial evidence in record permitted inference that appellee's alleged misrepresentation in contracting was fraudulent); *Phillips v. Mukluk Freight Lines, Inc.*, 721 P.2d 1143, 1145 (Alaska 1986) (holding that circumstantial evidence presented in expert witness's affidavit sufficed to raise genuine issue of material fact regarding whether appellee acted in bad faith).

**19.** Verified pleadings and documents are equivalent to affidavits. *See Bennett v. Weimar*, 975 P.2d 691, 695 (Alaska 1999) (citing *Smith v. Thompson*, 923 P.2d 101, 102 n. 1 (Alaska 1996)).

**20.** Bax's assertions that DeNardo was potentially dangerous did not convince the federal court. United States District Judge H. Russel Holland denied the protective order motion, and stated:

> The court has managed litigation involving Mr. DeNardo for approximately fifteen years. He has been involved in some thirty cases in this court. The court has never had a report of Mr. DeNardo behaving violently or having a weapon at any time in connection with any of these proceedings. The court is unpersuaded that there is any reason to believe that Mr. DeNardo would attempt to harm anyone in connection with this case. If, as is suggested, any of the parties or witnesses believe that Mr. DeNardo has been "stalking" them, that is a matter for the Anchorage Police Department to look into.

Because the order denying Bax's motion is not in the appellate record and was not before the superior court, I do not rely on its entry or text to demonstrate error here. I refer to it only to temper any premature conclusions a reader might draw about DeNardo based on the repetition in the court's opinion and in my dissent of Bax's comments about DeNardo. A court may properly rely on the order's result as an exercise in judicial notice, and on its text under the public records exception to the hearsay rule. *Hess v. State*, 20 P.3d 1121, 1127 (Alaska 2001) ("The evidence reliably reflects the fact of acquittal. A court thus may take judicial notice of the fact of an acquittal under Alaska Rule of Evidence 201(b)(2), as implicitly requested here. Or it may allow evidence of the acquittal to be introduced as a hearsay exception under Alaska Rule of Evidence 803(8) because the acquittal is a matter of public record.").

Nardo does not appear to argue here to the contrary. He argues instead that what Bax previously told her coworkers was actionable because Bax abused the conditional privilege that potentially applied.

**What Bax said (or may have said).** The court fails to address the potentially critical threshold question about what Bax actually told her coworkers. Its opinion assumes that Bax told them that she "was worried that he was 'stalking' me." [21]

The court's assumption apparently derives from Bax's April 4, 2001 affidavit. But that affidavit states only that Bax was "worried that he was 'stalking' me," not that she had told coworkers that she was "worried that he was 'stalking' me." The affidavit only generally describes what she told coworkers; it does not describe the content of any conversation with precision.

It is unclear from the record exactly what Bax told her coworkers.[22] There is a difference between what a declarant thinks and what a declarant actually declares. What

Bax actually told coworkers is material because the court's opinion assumes she was merely expressing to coworkers an opinion (belief, concern, worry), rather than a matter of fact.[23] It may also be assuming, among other things, that DeNardo must demonstrate that Bax knew she was not actually worried or that she spoke recklessly when she supposedly said she was worried, an arguably harder thing to establish than demonstrating that, when she accused him of stalking her, she either knew the accusation was false or recklessly disregarded its falsity.

Under Alaska law, defamation actions are constitutionally barred "where the allegedly defamatory statements are expressions of ideas and 'cannot reasonably be interpreted as stating actual facts about an individual.' "[24] The critical distinction is between "statements represented as 'expressions of ideas' and statements purporting to represent facts."[25] To ascertain whether a statement is factual, this court considers the context of the statement, including the speaker's use of cautionary or equivocating words.[26] If

21. At 675, 680 (quoting part of Bax's April 4, 2001 affidavit).

22. The superior court did not attempt to quote Bax's declarations; in granting Bax's motion for summary judgment, the court stated that it found that Bax, "to the extent that she made comments to co-workers that she felt she was being followed, that even if she used the word that she felt she was being stalked, that those comments ... were subject to privilege."

23. Thus, the court's opinion frequently quotes Bax's affidavit, or characterizes her statements, as expressing "worry," "concern," "fear," or a "belief" that DeNardo was stalking her. *Id.* at 675, 675, 678, 679, 680, 681, 682, 682, 683. The opinion fails to distinguish between what Bax stated in her 2001 affidavit about what she believed and what she may have actually said to coworkers. *See id.* at 674–75 ("DeNardo based his claim on comments made by Bax to coworkers that she was 'worried that [DeNardo] was "stalking" [her].' "); *id.* at 678 ("The superior court reasoned that the statements Bax made to coworkers that 'she felt she was being stalked' were conditionally privileged as statements of concern about personal safety in the workplace."); *id.* at 679 ("Where, as here, a worker reveals to coworkers that she is concerned that another coworker might be stalking her, a sufficiently important interest to the statement's publisher, her personal safety, is at stake."); *id.* at 680 ("We note that the false and defamatory

comment that Bax allegedly made was that Bax was worried that DeNardo was stalking her and not that he was in fact stalking her."); *id.* at 681 ("DeNardo had the opportunity to question witnesses about the basis for Bax's belief that De-Nardo was stalking her ...."); *id.* at 682 ("But evidence that Bax might have disliked DeNardo does not cast doubt upon her statement that she feared DeNardo was stalking her.").

24. *Sands v. Living Word Fellowship*, 34 P.3d 955, 960 (Alaska 2001) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)); *see also Moffatt*, 751 P.2d at 945 (holding that declarant's use of word "horrible" to describe medical procedure was "simply the opinion of the author" and was therefore protected by First Amendment).

25. *Kinzel*, 93 P.3d at 439; *see also id.* at 439–40 n. 50 (noting " 'that a distinction should be made between an evaluative-type opinion and the deductive type,' the latter actually imputing facts that can be proven false and thus potentially actionable") (quoting W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 113A, at 814–15 (5th ed.1984)).

26. *Kinzel*, 93 P.3d at 440 (considering whether prefatory phrase "I wonder" made allegedly defamatory statement protected conjecture); *see also Haynes v. Alred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir.1993), *cited in Kinzel*, 93 P.3d at

the speaker is expressing a subjective view, a speculation, or a theory, rather than claiming to possess objectively verifiable facts that confirm the truth of the statement, the statement is not actionable.[27] The court's opinion today seems to analyze the defamation claim as though Bax's statements were not statements of fact.[28]

We must therefore start by determining whether a factfinder could reasonably find from the record that Bax told others as a matter of fact that DeNardo stalked her, or followed her under circumstances that implied stalking. Her April 4, 2001 affidavit is ambiguous in describing what she said in 2000. Taken in isolation, it is possible to read it to imply that she told coworkers that she was "worried" DeNardo was stalking her, and that she was therefore only expressing a qualified opinion, not a statement of fact. The court's opinion seems to rely on this implication in deciding that it was not error to grant summary judgment to Bax.[29]

But that implication cannot be taken in isolation, and to do so would improperly take inferences in favor of the movant. Indeed, the words of the affidavit also reasonably permit an inference unfavorable to the movant, that she had expressed an unqualified statement of fact to coworkers that DeNardo had stalked her.

In any event, we must look beyond the affidavit to other evidence before the superior court. Bax's statements in discovery, supplied to the superior court by DeNardo, contain no such qualification. An interrogatory asked her to describe her communications with others regarding the facts of this case. Her sworn answer stated that during conver-

sations when she worked at ANI, she told Holly Parsons "that she had also noticed plaintiff follow her in his vehicle a couple of times, and seemed to be following her into a store on one occasion." It also stated that she "also told Ms. Parsons knowing plaintiff had followed her made her uncomfortable." Her answer further stated that "[o]n one occasion, Ms. Bax commented to Brandy Johnson, their supervisor, about plaintiff's following her . . . ." Likewise, when DeNardo's discovery requests asked Bax what actions Brandy Johnson took after Bax complained of plaintiff's stalking, Bax responded under oath that she did "not know what, if any, actions were taken *after she mentioned that she had seen DeNardo following her.*" (Emphasis added.)

For purposes of considering the propriety of Bax's summary judgment, these discovery answers compel an inference that Bax unqualifiedly told coworkers that DeNardo had followed her, not that she merely told them that she was "worried" or was "concerned" or had formed a "belief" that DeNardo had followed her.

In my view, the opinion's misapprehension about what Bax said misdirects the remainder of the opinion's analysis, both factually and legally. If this genuine issue is material, as the court's treatment implies, we must set aside the summary judgment.

This brings us to the two main factual disputes that preclude summary judgment.

**Knowledge or reckless disregard as to falsity of statements.** The first dispute is whether Bax knew of or recklessly disregarded the (possible) falsity of her statements that DeNardo had followed or stalked

---

440 ("A statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' but if it is plain that the speaker is expressing a subjective view . . . the statement is not actionable.").

**27.** *Kinzel,* 93 P.3d at 440.

**28.** The court's opinion does not, however, directly consider whether Bax's statements were statements of fact or expressions of ideas. And the court's opinion suggests that the statements were Bax's opinions, but does not discuss whether the statements were protected by the First Amendment. Thus the court's opinion blends the initial

phase of the defamation analysis (i.e., were the statements defamatory and actionable) with the abuse-of-the-privilege analysis (i.e., was there malice or publication for some other purpose). The same mistake contributed to the summary judgment order (which was entered in reliance on our opinion in *Briggs v. Newton,* 984 P.2d 1113, 1121 (Alaska 1999)).

**29.** Thus, the opinion frequently refers to the affidavit and characterizes Bax's statements to coworkers in terms of "worry," "concern," "fear," or "belief." At 675, 675, 678, 679, 680, 681, 682, 682, 683. These characterizations all appear to derive from how Bax's affidavit impliedly described her statements.

her. DeNardo's defamation complaint was verified. It is therefore to be treated as an affidavit.[30] It alleged that Bax and others had stated that DeNardo was stalking them or had stalked them. It then alleged that "DeNardo at no time stalked, followed, and/or loitered outside defendants' residences." Although that denial may be ambiguous—it is unclear whether "outside defendants' residences" modifies "stalked" or "followed"—the verified complaint also asserted that the defendants' (and thus Bax's) statements that DeNardo had stalked Bax were "false." DeNardo also expressed an unqualified denial when Bax moved for summary judgment; his verified opposition to her motion stated: "Plaintiff never stalked Joy Bax James, Holly Parsons, or Annie Harris." In response to Bax's assertion in her summary judgment motion that plaintiff never denied stalking Bax, DeNardo stated in his verified opposition: "Au contraire, plaintiff specifically denied stalking in § III ¶ 12 in plaintiff's verified complaint."

Other circumstances also reasonably permit inferences that DeNardo had not actually stalked or followed Bax and that Bax did not really think he had.[31] This included evidence, contained in Bax's discovery responses, that Bax had not complained of stalking to anyone but her coworkers. As DeNardo points out, her discovery responses revealed that she did not complain to her husband, her two children (one of whom was then about twelve years old), police, or ANI supervisors, and that she did not tell any of them that she thought DeNardo presented a threat to workplace safety because he had followed or stalked her. Bax admitted in discovery that there were "never any verbal or written statements" that DeNardo had stalked Bax.

Furthermore, in discovery Bax identified no witnesses to stalking and did not remember the dates of any stalking. DeNardo also correctly noted that Bax, who had complained to sales manager Brandy Johnson, never followed up regarding her stalking complaints and did not know what, if any, actions were taken by Parsons.

DeNardo's verified opposition described circumstances that he contended confirmed that Bax had spoken falsely in accusing him of stalking her. Some of these circumstances may be suspect because they were not a matter of personal prior knowledge or observation to DeNardo. But to the extent these circumstances are based on DeNardo's interpretation of what Bax and others said in response to discovery and in other court papers, we may consider them in deciding whether summary judgment was entered erroneously. These circumstances, if they are correct, tend to support a conclusion that DeNardo did not actually stalk or follow Bax;[32] they consequently also support a conclusion that Bax knew that DeNardo had not followed or stalked her and therefore that she was not really worried that DeNardo had followed or stalked her.[33]

DeNardo's verified opposition also described several circumstances about which he had personal knowledge that would reasonably permit an inference that Bax was not actually afraid of DeNardo or that she had spoken falsely to others about DeNardo. Thus, his opposition asserted that during a March 8, 2001 intermission in his deposition, he had shared lunch with Bax, Parsons, and Harris. About that event he stated that "[n]obody displayed any fear and nobody objected." This circumstance would permit (although certainly not compel) a finding that

---

**30.** *See Bennett v. Weimar*, 975 P.2d 691, 695 (Alaska 1999) (citing *Smith v. Thompson*, 923 P.2d 101, 102 n. 1 (Alaska 1996)).

**31.** Because there is no direct evidence of Bax's belief in the truthfulness of her allegedly defamatory statements, DeNardo's most viable approach to showing abuse of the conditional privilege on malice grounds is to convince the fact finder that (a) Bax's statements that DeNardo stalked her were false and that (b) Bax therefore must have known her belief that DeNardo had stalked her was false.

**32.** The superior court itself declined to grant Bax summary judgment on the falsity prong of her defamation claim. The superior court noted that DeNardo had raised a triable issue of fact regarding whether Bax's claim that DeNardo followed her was false.

**33.** Thus, even if Bax actually did tell coworkers that she was "worried that" DeNardo stalked her, DeNardo presented sufficient evidence to put into genuine dispute whether she was actually worried that he stalked her.

Bax did not, even as of 2001, consider De-Nardo to present a threat of harm.[34] Given the assertion in her 2001 affidavit that she was currently concerned about her safety in DeNardo's presence, a shared lunch also seems to raise credibility questions about the truth of the other averments in her affidavit. It thus potentially raises a question about whether it is true that in 2000 she was "worried" about her safety and whether she was truthful when she allegedly told cowork-ers that DeNardo had followed or stalked her. DeNardo's opposition also asserted that he had filed, when he was her coworker at ANI, an evaluation and notice of discrimi-nation that named Bax as a "major perpetra-tor" in creating a hostile work place. Bax's knowledge of his complaint is some evidence that would tend to show that Bax might have had a motive—retaliation—to speak falsely or recklessly. Likewise, evidence of her al-leged interest in his customer lists and com-missions would tend to demonstrate another motive for knowingly false or reckless speech.

**Purpose of the statements.** This brings us to the last factual dispute: whether Bax in fact spoke for a purpose that was privileged. DeNardo asserted in his verified complaint that Bax's statements were made maliciously, and were intended to harm him. DeNardo asserts here that Bax was motivated to ac-cuse him falsely by her "persistent efforts coveting DeNardo's customer lists and com-missions." He asserts that Bax knew her statements were false and that "she intended to injure plaintiff in his reputation and well-being." DeNardo claims that the "malicious groundlessness" of her stalking accusations must be considered in context of her discov-ery responses. He claims that she admits

she read DeNardo's office evaluation, which DeNardo characterizes as "detailing Bax's activities to hijack DeNardo's advertising ac-counts and create a discriminatory and hos-tile work environment." He asserts that it is "important" that her accusation took place after she read DeNardo's evaluation accusing her and the other employees of "account theft and heinous discriminatory conduct." DeNardo asserts that Bax "fabricated her stalking accusations to cause DeNardo's ter-mination and obtain his client list." [35]

The evidence that potentially supports a finding that Bax acted either maliciously or not for the privileged purpose is not neces-sarily compelling, but it is nonetheless suffi-cient to preclude summary judgment on this issue.[36] DeNardo had disputes with Bax and other coworkers about retaining his accounts. There were mutual accusations of account piracy. DeNardo's ten-page "feedback" eval-uation of February 11, 2000 asserted that accounts had been distributed in a discrimi-natory fashion that disfavored him and fa-vored Bax. He asserted in the same docu-ment that Bax had continually attempted to claim his accounts as her own. His June 23, 2000 complaint to ANI management asserted that Bax and others had "purposely joined together to create a hostile and vindictive office atmosphere focused against me." These assertions are not easily documented; the existence of the two documents and Bax's apparent admission that she had seen them reasonably permit an inference that there were reasons why, apart from workplace safety, Bax might have told others that De-Nardo was following or stalking her.

Moreover, the facts discussed above that permit an inference that Bax had falsely

---

**34.** Such a finding on remand would also be supported by the fact that the federal judge who denied Bax's protective order motion apparently did not consider DeNardo to present a threat of harm, either.

**35.** Likewise to similar effect, DeNardo asserts on appeal that Bax "deliberately made her *per se* defamatory stalking accusations in order to ob-tain DeNardo's advertising accounts, destroy his credibility, and hide the extent of her discrimina-tory conduct memorialized in DeNardo's case against Calista and Alaska Newspapers, Inc."

**36.** In contrast to the impression the court's opin-ion might leave, at 681–682, DeNardo does not have to *prove* on summary judgment that Bax's predominant purpose was spite or ill will (or some other non-privileged purpose), but only needs to raise a genuine issue such that reason-able jurors could disagree over Bax's predomi-nant purpose. *See Hatten v. Union Oil Co. of Cal.,* 778 P.2d 1150, 1153 (Alaska 1989) (holding that where determining employer's predominant motive for firing employee involved balancing evidence and weighing credibility, question of predominant motive should have been decided by trier of fact).

accused DeNardo of stalking her also imply that her motive for saying those things was not to promote workplace safety. Thus, evidence that Bax had not complained of stalking to her husband, her children, police, or ANI supervisors and that she had not told any of them that DeNardo presented a threat to workplace safety because he had followed or stalked her, reasonably implies that Bax was not motivated by workplace safety or even personal safety when she spoke. It implies instead that she spoke for some other—and therefore unprivileged and impermissible—purpose. Likewise, DeNardo noted, correctly it seems, that Bax, who had complained to sales manager Brandy Johnson, never followed up regarding her stalking complaints and did not know what, if any, actions were taken by Parsons. And again, DeNardo contended that personal safety could not have been Bax's genuine reason for speaking, given that DeNardo shared lunch with Bax and other defendants during an intermission in his 2001 deposition. Having lunch with DeNardo also seems potentially inconsistent with Bax's assertion in her 2001 affidavit that "I am very concerned about my personal safety in Mr. DeNardo's presence." This raises a credibility question that casts into doubt her predominant motive for speaking.

**Conclusion.** Any one of these three factual disputes precludes summary judgment and precludes affirmance. We should therefore vacate the summary judgment and remand for further proceedings.